UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____x

JUDITH KARPOVA,

                Plaintiff,

        - against -                    05 Civ. 5812 (CM)

JOHN SNOW, SECRETARY, DEPARTMENT OF
THE TREASURY, and UNITED STATES OF
AMERICA,

                Defendants.

_____x

**ORDER AND DECISION GRANTING DEFENDANTS' MOTION TO DISMISS,
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

McMahon, J.:

> One who breaks an unjust law must do so openly, lovingly, and with
> a willingness to accept the consequences.
>
>           Martin Luther King, Jr.
>           From "Letter from a Birmingham Jail," April 16, 1963.

       The hallmark of civil disobedience is the willingness of the perpetrator to pay the price of

his actions. The plaintiff in this case, Judith Karpova, broke American law by going to Iraq in

violation of certain Treasury Department regulations, so she could serve as a "human shield" and

protect elements of Iraqi infrastructure in the weeks preceding the American invasion of that

country. For her actions, she was sanctioned, by imposition of a civil penalty authorized under

these regulations.

       Apparently, Ms. Karpova does not want to pay this price. Instead, she brings this action,

seeking rescission of the $6,700 civil penalty imposed on her, pursuant to the Iraqi Sanctions

Regulations (the "Regulations"), by the Department of Treasury's Office of Foreign Assets Control ("OFAC"). Plaintiff claims that she was in Iraq, *inter alia*, as a journalist, and so was exempt from the reach of the Regulations (which contain an exception for journalistic activity). She claims that the Regulations unconstitutionally restrict her First Amendment right of free speech and her Fifth Amendment right to travel, and that the penalty was imposed without affording her an adequate opportunity to be heard, in violation of her right to Due Process under the Fifth Amendment. Finally, plaintiff claims that she was penalized arbitrarily and capriciously, either because the activity for which she was cited did not violate the Regulations or because the Regulations are not authorized under the law.

Defendants John Snow and the United States of America (collectively, the "defendants") move to dismiss the Complaint for failure to state a claim or, in the alternative, for summary judgment. The motion is granted.

## Statutory and Regulatory Background

As a general rule, the President enjoys broad economic powers in the realm of foreign policy. The United Nations Participation Act ("UNPA"), passed in 1945, confers upon the President the authority to "investigate, regulate, or prohibit, in whole or in part, economic relations or rail, sea, air, postal, telegraphic, radio, and other means of communications between any foreign country or any national thereof or any person therein and the United States or any person subject to the jurisdiction thereof, or involving any property subject to the jurisdiction of the United States." 22 U.S.C. § 287c(a). Similarly, the International Emergency Economic Powers Act ("IEEPA"), which Congress passed in 1977, authorizes the President to exercise economic powers by declaring a national emergency with respect to "any unusual and

extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States . . ." 50 U.S.C. § 1701(a).

With respect to Iraq, Congress specifically has authorized the President to implement economic sanctions as a foreign policy and national security measure. The Iraqi Sanctions Act of 1990, passed shortly after Iraq's invasion of Kuwait on August 2, 1990, expresses support for ". . . the imposition and enforcement of multilateral sanctions against Iraq," and directs the President to ". . . continue to impose the trade embargo and other economic sanctions with respect to Iraq and Kuwait." Pub. L. No. 101-513, § 586A(5), 104 Stat. 1979, 2047; § 586C(a), 104 Stat. 1979, 2048 (1990).

Pursuant to this statutory authority, President George H. W. Bush issued an Executive Order in which he concluded, ". . . that the policies and actions of the Government of Iraq constitute an unusual and extraordinary threat to the national security and foreign policy of the United States and . . . declare[d] a national emergency to deal with that threat." Executive Order 12,722, 55 Fed. Reg. 31,803 (Aug. 2, 1990). In a subsequent Executive Order, the President (1) directed that economic sanctions be imposed on Iraq, and (2) authorized the Secretary of Treasury, in consultation with the Secretary of State, to promulgate regulations implementing prohibitions on, among other things, the exportation of services to Iraq and transactions relating to travel in Iraq or activities within Iraq. Executive Order 12,724, 55 Fed. Reg. 33,089 (Aug. 9, 1990).

On January 18, 1991, OFAC issued the Iraqi Sanctions Regulations, which implemented the prohibitions outlined in the President's Executive Orders and delineated procedures for

dealing with violations.  See 31 C.F.R. §§ 575.201- 211, 575.702-704.  Pursuant to the

Regulations, upon the Director of OFAC's reasonable belief that a violation has occurred, OFAC

shall issue a Prepenalty Notice ("PPN") to the alleged offender.  This notice informs the

recipient that OFAC intends to impose a monetary penalty for a violation of the Iraqi Sanctions

Regulations unless, within thirty days of the mailing of the notice, the recipient tenders a written

response setting forth the reasons why the proposed penalty should be decreased or should not be

imposed at all.  See 31 C.F.R. §§ 575.702, 703.  After considering any such written presentation,

the Director of OFAC makes a final determination about whether a violation has occurred and, if

so, what penalty shall be assessed.  OFAC is required to issue a Penalty Notice setting out the

basis for the decision.  See 31 C.F.R. § 575.704.

## Factual Background

The relevant facts are as follows:

In February, 2003, as a member of the Truth Justice Peace Action Project ("TJP

Project"), plaintiff traveled to Iraq.  The primary purpose of her trip was to serve as a so-called

"human shield" in the event of a U.S. invasion of Iraq.  (Complaint ("Cplt.") ¶¶ 10-11).  As a

human shield, plaintiff's mission was to protect the Iraqi infrastructure, by "actually going to

such infrastructure sites, either to publicize the threat to them or to physically remain on such

sites and protect them with [her life]."  (Administrative Record ("AR") at 0035).  Using a visa

obtained through the TJP Project, plaintiff arrived in Iraq on February 19, 2003.  (AR at 0033,

0035).

Prior to leaving the United States, for Iraq,  plaintiff solicited donations to fund her trip.

(AR at 0041).  However, once she arrived in Iraq, she, like many other human shields, was

hosted by the Peace, Friendship and Solidarity Organization ("PFSO"), an Iraqi Non-Governmental Organization. (AR at 0037). The PFSO provided plaintiff with hotels, meals and travel into and within Iraq. (AR at 0037).

Plaintiff remained in Iraq as a human shield until March 9, 2003, when she traveled to Jordan before returning to the United States. (AR at 0033).

On March 20, 2003, OFAC sent plaintiff a Requirement to Furnish Information ("RFI"), based on OFAC's receipt of information indicating that plaintiff, who had not been licensed to engage in "travel transactions" in Iraq, had traveled to Iraq in February-March 2003. (AR at 0028). In response to the RFI, plaintiff submitted a letter, dated April 21, 2003, describing her trip. (AR at 0033-0038). In the letter, plaintiff explained that she went to Iraq in three capacities: (1) as a member of the community of faith seeking to "bear witness to the effect of the sanctions" imposed on Iraq by the United States; (2) as a writer, leading to publication in *The Jersey Journal* newspaper of several of her letters home, and (3) as a human shield. (AR at 0033-36).

On June 2, 2003, plaintiff's case was referred from OFAC's Enforcement Division to its Civil Penalties Division. (AR at 0026). On June 23, 2004, OFAC sent plaintiff a PPN, informing her that OFAC intended to impose on her a civil penalty of $10,000 for exporting services to Iraq and for engaging in unauthorized travel-related transactions in Iraq. (Cplt. ¶ 18; AR at 0023-0024). The specific violations listed in the PPN include plaintiff's ". . . attempt[] to collect funds for [her] travel expenses to/from/within Iraq . . . shielding a [Government of Iraq] infrastructure from possible U.S. military action . . . purchase of food until [her] return to Amman, Jordan . . ." (AR at 0023). The PPN advised plaintiff that she had the right to respond

in writing within thirty days.  (AR at 0024).

On August 5, 2004, plaintiff, through counsel, submitted a written response to the PPN. In it, she objected to the imposition of a civil penalty, claiming that she provided "'no services' to any agency of the Iraqi government."  (AR at 0007).  She also maintained that the regulatory structure in place to effect the sanction violated her due process rights; that the Regulations exceed the authority of the Executive Branch; and that the sanctions trespassed her First and Fifth Amendment rights.  (AR at 0007-0010).

On March 14, 2005, OFAC issued plaintiff a Penalty Notice, imposing a civil penalty for violation of the Regulations and underlying statutory authority.  (AR at 0001-0002).  Plaintiff was penalized for exporting services to Iraq and engaging in transactions related to travel in Iraq and activities within Iraq absent prior license or other authorization, as specifically set out in the PPN.  (AR at 0001-0002).  The Penalty Notice stated that, because "this is your first offense on record at OFAC and you provided a written response to the [PPN]," the proposed civil penalty "in the amount of $10,000 is hereby reduced by 33% to $6,700."  (AR at 0002).

On June 9, 2005, plaintiff brought this action.  She challenges imposition of the civil penalty, alleging that it was imposed arbitrarily and capriciously and in violation of various of her constitutional rights.  Plaintiff also alleges that the Regulations themselves are both unconstitutional and not authorized by any law.  Plaintiff seeks a declaration that the Penalty Notice is null and void and a permanent injunction preventing defendants from restricting plaintiff's right to free speech and travel.

Defendants move to dismiss the Complaint pursuant to Rule 12(b)(6) for failure to state a claim or, in the alternative, for summary judgment.

**Standard of Review**

Dismissal of a complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is proper where "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." <u>Harris v. City of New York</u>, 186 F.3d 243, 247 (2d Cir.1999). The test is not whether the plaintiff ultimately is likely to prevail, but whether he is entitled to offer evidence to support his claims. <u>Chance v. Armstrong</u>, 143 F.3d 698, 701 (2d Cir.1998). The court assumes that all factual allegations in the complaint are true, and draws all reasonable inferences in the plaintiff's favor. <u>EEOC v. Staten Island Sav. Bank</u>, 207 F.3d 144, 148 (2d Cir.2000). "In considering a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." <u>Kramer v. Time Warner, Inc.</u> 937 F.2d 767, 773 (2d Cir. 1991).

A party is entitled to summary judgment pursuant to Rule 56 when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986). Whether any disputed issue of fact exists is for the Court to determine. <u>Balderman v. United States Veterans Admin.</u>, 870 F.2d 57, 60 (2d Cir. 1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. <u>Celotex v. Catrett</u>, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must present

7

"specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation" and "must do more than simply show that there is some *metaphysical doubt* as to the material facts." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); Matsushita Elec. Indus. Co., 475 U.S. at 586 (citations omitted). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." Anderson, 477 U.S. at 248.

Plaintiff's first cause of action properly is dismissed under 12(b)(6). As to plaintiff's second and third causes of action, summary judgment is the proper procedural vehicle. The parties have submitted the complete Administrative Record relating to OFAC's action against Ms. Karpova and, as the parties have no right to add to the Administrative Record, see Camp v. Pitts, 411 U.S. 138, 142 (1973) (holding that, in an APA case, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"), the court has before it all of the information necessary to determine whether material disputes of fact exist.

Because defendants made this motion in the alternative, under both Rules 12(b) and 56, plaintiff has always been on notice that the Court has been asked to grant summary judgment should that be appropriate. Thus, no issue of motion conversion and notice is presented. Gurary v. Winehouse, 190 F. 3d 37, 43 (2d Cir. 1999).

**Discussion**

A.  The Sanctions Against Plaintiff Were Not Imposed Arbitrarily or Capriciously, So Defendants' Motion for Summary Judgment Dismissing the Third Cause of Action Must Be Granted.

Plaintiff's third cause of action, brought pursuant to the Administrative Procedure Act ("APA"), alleges that the $6,700 civil penalty was imposed on her by OFAC arbitrarily and capriciously.  After reviewing the Administrative Record, the court finds that OFAC's determination was neither arbitrary nor capricious – and certainly was not contrary to law.  For this reason, the court declines to set aside the civil penalty and grants defendants' motion for summary judgment.

1.  *Standard of Review*

Under the APA, a reviewing court may "hold unlawful and set aside agency action, findings and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  "Review under this provision is 'narrow,' limited to examining the administrative record to determine 'whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"  Natural Res. Def. Council v. Muszynski, 268 F.3d 91, 97 (2d Cir. 2001) (quoting City of New York v. Shalala, 34 F.3d 1161, 1167 (2d Cir. 1994)).  The court does not undertake its own fact-finding.  "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  State of New York Dep't of Soc. Serv. v. Shalala, 21 F.3d 485, 493 (2d Cir. 1994) (quoting Camp, 411 U.S. at 142).  In reviewing an agency action, the "court may not substitute its judgment for that of the agency."  Muszynski, 268 F.3d at 97 (quoting City of New York v.

Shalala, 34 F.3d at 1167).  Rather, an agency decision may be set aside only where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Id.

Agency determinations in the area of foreign relations are owed particularly great deference.  See Immigration & Naturalization Serv. v. Abudu, 485 U.S. 94, 110 (1988).  The United States Supreme court has already found that OFAC's regulations imposing economic sanctions against a foreign country involve "weighty concerns of foreign policy," and thus enjoy this extremely high level of deference.  See Regan v. Wald, 468 U.S. 222, 242 (1984).

Applying this highly deferential standard, the court concludes that OFAC's civil penalty determination was neither arbitrary nor capricious.

2.    *Exportation of Services to Iraq*

Section 575.205 of the Regulations provides:

> Except as otherwise authorized, no goods, technology (including technical data or other information), or services may be exported from the United States, or if subject to U.S. jurisdiction, exported or reexported from a third county to Iraq, to any entity owned or controlled by the Government of Iraq, or to any entity operated from Iraq, except donated foodstuffs in humanitarian circumstances, and donated supplies intended strictly for medical purposes, the exportation of which has been specifically licensed pursuant to § 575.507, 575.517 or 575.518.

31 C.F.R. § 575.205.  The Penalty Notice finds plaintiff guilty of engaging in the exportation of services to Iraq, in violation of this section of the Regulations and the underlying statutes and Executive Orders.  (AR at 0001-0002).

Plaintiff argues that her activity as a human shield did not qualify as a "service" within

the meaning of the Regulations. Because the term "service" is not defined in the Regulations, the court must defer to OFAC's interpretation of the term, ". . . even if the agency's reading differs from what the court believes is the best [] interpretation." See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Serv., 125 S. Ct. 2688, 2699 (2005); Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984). The Supreme Court has held that, in construing administrative regulations, "[T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." United States v. Larionoff, 431 U.S. 864, 872 (1977) (quoting Bowles v. Seminole Rock Co., 325 U.S. 410, 414 (1945)). To be sustained, an agency's interpretation must merely be reasonable. "We need not find that its construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." Udall v. Tallman, 380 U.S. 1, 16 (1965).

Under this framework, OFAC's conclusion that plaintiff's activities in Iraq constituted "services" within the meaning of the Regulations cannot be deemed arbitrary and capricious.

The Supreme Court often has relied on dictionary definitions as a means of determining the reasonableness of an agency's interpretation of a term. In this case, Black's Law Dictionary defines "service" in part as: "[a]n intangible commodity in the form of human effort such as labor, skill, or advice." Black's Law Dictionary 1372 (7th ed. 1999). Similarly, the Merriam-Webster Online Dictionary defines "service" in part as: "contribution to the welfare of others," "a helpful act" and "useful labor that does not produce a tangible commodity." Merriam-Webster Online, http://www.webster.com/cgi-bin/dictionary?book=Dictionary&va=service&x=15&y=24.          Plaintiff admits that, as a

human shield, she actually went to infrastructure sites, "either to publicize the threat to them or to physically remain on such sites and protect them with [her life]." (AR at 0035). It is not unreasonable to construe the act of protecting Iraqi infrastructure as providing Iraq with "an intangible commodity in the form of human effort," which was designed to "contribut[e] to the welfare of others." Infrastructure protection is an intangible commodity. Plaintiff exerted human effort to provide Iraq with that commodity. And she did so to contribute to the welfare of others.

The issue is not whether the court would have reached the same conclusion as the relevant administrative official. The issue is whether the administrative official reached an unreasonable conclusion. He did not.

The court rejects as erroneous and irrelevant plaintiff's contentions that she did not provide a "service" because (1) her actions as a human shield were, in the end, not helpful, and (2) she sought to aid the Iraqi people rather than the Iraqi government. As to her first reason, nothing in the Regulations condition a violation on the success of plaintiff's endeavor; and even if plaintiff was unable to stop the bombing of the sites she "shielded," by her presence she succeeded in warning Iraqis of the threat to these sites. As to the second, the Regulations are not limited in application to the exportation of services to the Iraqi government. Export of any goods, technology or services to Iraq is prohibited. See 31. C.F.R. 575.205. By her own admission plaintiff intended to provide assistance to the people of Iraq. What she did was designed to contribute to the welfare of the Iraqi people. That is what the Regulations forbid.

OFAC's determination that plaintiff violated the Regulations by providing a service was not arbitrary and capricious.

3.      *Transactions Relating to Travel in Iraq or Activities within Iraq*

Section 575.207 of the Regulations provide:

Except as otherwise authorized, no U.S. person may engage in any transaction relating to travel by any U.S. citizen or permanent resident alien to Iraq, or activities by any U.S. citizen or permanent resident alien within Iraq, after the effective date, other than transactions:

(a)      Necessary to effect the departure of a U.S. citizen or permanent resident alien from Kuwait or Iraq;

(b)      Relating to travel activities for conduct of the official business of the United States Government or the United Nations; or

(c)      Relating to journalistic activity by persons regularly employed in such capacity by a newsgathering organization.

This section prohibits the unauthorized payment by a U.S. person of his or her own travel or living expenses to or within Iraq.

31 C.F.R. 575.207.  Pursuant to the Penalty Notice, plaintiff was found to have engaged in transactions related to travel in Iraq and activities within Iraq absent prior license or other authorization from OFAC.  (AR at 0001-0002).  As set forth in the PPN, these activities included solicitation of money to fund her travels and the purchase of food in Iraq.  (AR at 0023).

The Administrative Record contains statements by plaintiff that she intended to pay for her travel, at least in part, and that, before traveling to Iraq, she solicited money to help pay for her travel.  In a letter from plaintiff to other anti-war activists, plaintiff asked for "small donations," which "will be earmarked to help finance my travel expenses."  (AR at 0041).  Likewise, in a letter that was published in *The Jersey Journal*, plaintiff stated, "We're in different hotels, as guests for a few days or a week until we get ourselves organized.  Then we'll pay like everyone else."  (AR at 0055).

13

Plaintiff argues that there is no evidence in the Administrative Record that she actually obtained funds or paid for any part of her travels. Of course, if there is really "no evidence" that plaintiff engaged in sanctionable conduct, imposing a sanction would be arbitrary and capricious. But there is ample evidence that plaintiff solicited funds to pay for her trip to Iraq. Indeed, she admits as much. The court cannot say that it was unreasonable for OFAC to conclude that the solicitation of funds, regardless of the success of the solicitation, violated the Regulations. The Regulations govern plaintiff's conduct, not the conduct of others. They prohibit any "transaction" relating to travel by a U.S. citizen to or within Iraq. It is not unreasonable for the Treasury Department to interpret those Regulations as prohibiting the solicitation of funds – which constitutes a transaction[1] – for use in paying for illicit travel to Iraq. The undisputed evidence shows that plaintiff did precisely that. Again, whether this court would have found otherwise is of no moment.

Plaintiff also asserts that she could not be found guilty of this particular violation because, as a journalist, she was exempt from the ban on travel to Iraq. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. to Dismiss ("Opp.") at 9). Section 575.207 does exempt, "Authorized travel transactions [] incident to travel for the purpose of collecting and disseminating information for a

_____

[1] The Regulations do not define the term "transaction." However, Blacks Law Dictionary defines "transaction" as: "the act or an instance of conducting business or other dealing," "something performed or carried out; a business arrangement or exchange," "any activity involving two or more persons." Black's Law Dictionary 1372 (7th ed. 1999). The Merriam-Webster Online Dictionary defines "transaction" in part as: "a communicative action or activity involving two parties or things that reciprocally affect or influence each other." Merriam-Webster Online, http://www.webster.com/cgi-bin/dictionary?book=Dictionary&va=service&x=15&y=24. Plaintiff's solicitation of funds was certainly a "communicative action or activity" "involving two or more persons," and thus clearly qualifies as a "transaction."

recognized newsgathering organization . . ." 31 C.F.R. § 575.416(b)(3).  However, this

exemption does not apply to plaintiff, because she admits that she went to Iraq in capacities other

than  as a writer – in particular, as a human shield.  (AR at 0033-0038).  Even if plaintiff were a

journalist – and there is some question whether she so qualifies[2] – that status does not provide a

blanket exemption for any and all travel transactions relating to a U.S. citizen's presence in Iraq.

The journalistic activity exemption expressly "do[es] not include travel transactions related to

*any other activity* in Iraq."  31 C.F.R. § 575.416(b)(3).  Clearly some of plaintiff's activity in

Iraq was not "journalistic" in nature.  Acting as a human shield is not "collecting and

disseminating information for a recognized newsgathering organization."  Therefore, travel

transactions relating to that activity are sanctionable.

Plaintiff was not sanctioned for the publication of her letters or for any other arguably

journalistic activity.  The fact that plaintiff published an account of her adventure in Iraq does

not insulate from punishment her clearly illegal activity  –  any more than a CNN reporter would

be exempt for travel transactions connected with his smuggling of contraband.

---

[2]  Section 575.416 of the Regulations defines a "journalist" as a person who "is employed in a constant or regular manner by a recognized newsgathering organization."  Moreover, "Free-lance journalists should have an assignment from a recognized newsgathering organization requiring travel to Iraq, or be able to demonstrate that publication by a recognized newsgathering organization of a work requiring such travel is likely.  The latter may be demonstrated by providing a resume listing previously published free-lance works or copies of previously published works."  31 C.F.R. § 575.416(b)(1).  While three of plaintiff's letters were, in fact, published in *The Jersey Journal*, plaintiff did not take the position with OFAC that she was regularly employed by any recognized newsgathering organization or that she went to Iraq on assignment at the behest of any such organization.  Nor did plaintiff indicate, when she was securing her travel documents, that it was likely that a newsgathering organization would publish an account of her journey.  In fact, she got her visa through an anti-war protest group.  The mere fact that a local newspaper published her letters would not suffice to make plaintiff a "journalist" within the meaning of the Regulation.

4.      *Underlying Authority for Regulations*

Plaintiff argues that the Regulations themselves exceed presidential authority.  She is incorrect.

First, plaintiff erroneously claims that the IEEPA is "[t]he only statutory authority" underlying the Regulations, and that her conduct does not fall within any of the activities Congress has authorized the President to sanction under the IEEPA.  (Opp. at 8).  This is simply false.  As discussed above, the Regulations are supported by the IEEPA, UNPA and Iraqi Sanctions Act, as well as Executive Orders 12,722 and 12,724.  Moreover, the IEEPA grants the President "sweeping powers" and "broad authority," see, e.g., Paradissiotis v. Rubin, 171 F.3d 983, 988 (5th Cir. 1999), which would make it, in and of itself, a lawful basis for the sort of regulations applied to plaintiff.

Second, plaintiff maintains that, "President Bush lacked a predicate for imposition and extension of the economic sanctions," because ". . . the Iraqi regime did not pose an urgent threat to the security of the United States."  (Opp. at 11).  However, "Matters relating to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."  Regan, 468 U.S. at 242 (quoting Harisiades v. Shaughnessy, 342 U.S. 580, 589 (1952)) (rejecting respondent's contention that restrictions on travel to Cuba were not justified because no "emergency" existed).  "The APA has never been construed to grant to this or any other court the power to review the wisdom of policy decisions of the President."  DKT Mem'l Fund Ltd. v. Agency for Int'l Dev., 887 F.2d 275, 281 (D.C. Cir. 1989).  The court declines plaintiff's invitation to insert itself into a debate foreclosed to it by the doctrine of separation of powers and long-settled precedent.

**B.**    Because Plaintiff Was Accorded All the Process She was Due, Defendants Are Entitled to Summary Judgment Dismissing Her FifthAmendment Lack of Due Process Claim

In her second cause of action, plaintiff claims that OFAC's imposition of a civil penalty infringed her right to due process of law as protected by the Fifth Amendment to the United States Constitution.  This claim is frivolous.

The Due Process Clause guarantees that no one shall be deprived of life, liberty or property without two things: notice and a meaningful opportunity to be heard.  Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).  However, due process, ". . . unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances."  Gilbert v. Homar, 520 U.S. 924, 930 (1997) (citing Cafeteria & Rest. Workers v. McElroy, 367 U.S. 886, 895 (1961)).  Rather, it ". . . is flexible and calls for such procedural protections as the particular situation demands."  Id. (citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).

The Regulations outline the procedures to be followed by OFAC whenever the Director reasonably believes that a violation has occurred.  They require issuance of a PPN – a notice that OFAC believes a violation has occurred and a civil penalty should be imposed – and an opportunity for the recipient of the PPN to make a written presentation controverting the allegations contained in the PPN.  OFAC is also required to memorialize its final determination in a Penalty Notice.  See 31 C.F.R. § 575.702-704.

The PPN, which is issued before the penalty is imposed and which must ". . . describe the violation, specify the laws and regulations allegedly violated, and state the amount of the proposed monetary penalty," satisfies the Due Process Clause's notice requirement.  The opportunity to controvert the charge in writing gives a person in plaintiff's position a meaningful

opportunity to be heard.  31 C.F.R. § 575.702-702.  OFAC followed its procedures in this case.

There is, therefore, no question that the Mullane test has been satisfied.

The Regulations do not call for a testimonial hearing.  However, they do not have to in

order to satisfy due process.  In the context of  administrative proceedings, the Supreme Court

has held, "There is no inexorable requirement that oral testimony must be heard in every

administrative proceeding in which it is tendered." Fed. Deposit Ins. Corp. v. Mallen, 486 U.S.

230, 247-48 (1988).  Likewise, the Second Circuit "declin[es] to attach talismanic significance"

to the availability of a testimonial oral hearing, and has held that, in the context of an

administrative proceeding, written submissions constitute a meaningful opportunity to be heard.

Interboro Inst., Inc., v. Foley, 985 F.2d 90, 93 (2d Cir. 1993) (citing Oberlander v. Perales, 740

F.2d 116 (2d Cir. 1984)); see also Flannelly v. Bd. of Tr., 6 F.Supp.2d 266, 268 (S.D.N.Y. 1998).

Despite this settled law, plaintiff argues that she had "no chance to challenge erroneous

agency information" or "presumptions which could have been assailed and cured at a hearing,"

and thus was denied a meaningful opportunity to be heard.  (Opp. at 18-19).  But neither in her

written response to the PPN nor in her Opposition to Defendants' Motion to Dismiss did plaintiff

identify a single fact in the agency's possession that was wrong or any presumption that could

not have been addressed in writing.

The court likewise rejects plaintiff's suggestion that she was denied due process in other

respects.  First, plaintiff has sought and obtained judicial review in this court of OFAC's final

determination.  See 5 U.S.C. § 706(2)(A).  Second, ". . . there is a presumption of honesty and

integrity in those serving as adjudicators," and neither the Complaint nor the Administrative

Record suggests in any way that the Director of OFAC had a disqualifying interest in this matter

or otherwise lacked neutrality.  See Withrow v. Larkin, 421 U.S. 35, 47 (1975).  Third, because "... we do not require an agency to provide procedures which approximate a judicial trial," plaintiff had no right to confront and cross-examine witnesses.  Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 164 (D.C. Cir. 2003) (citing Nat'l Council of Resistance of Iran v. Dep't of State, 251 F.3d 192, 209 (D.C. Cir. 2001)).

The facts in this case are remarkably similar to those in Holy Land, *supra*.  In that case, OFAC had designated the Holy Land Foundation for Relief and Development (HLF), the largest Muslim charitable organization in the United States, as a terrorist supporter for purposes of blocking its assets and shutting down the organization.  Following notification from OFAC that it intended to reopen the administrative record and redesignate HLF, the organization was given an opportunity to respond through written submissions, which it did.  However, HLF was not provided a testimonial hearing.  The Holy Land court held that OFAC had  provided HLF "... with the requisite notice and opportunity for response necessary to satisfy due process requirements."  Holy Land, 333 F.3d at 164.

Plaintiff tries to distinguish Holy Land on the ground that, in contrast to this case, there was a need for "quick action by the government" to prevent the use of HLF assets in international terrorism, thus justifying post-deprivation due process.  However, like Ms. Karpova, HLF was afforded pre- not post-deprivation process.  Moreover, any need for haste did not dictate the result in that case.  Rather, the court considered the process afforded HLF and found that the notice and opportunity to be heard through written submissions satisfied the requirements of the Due Process Clause.  Id. at 163-64.

Here, as in Holy Land, plaintiff was afforded adequate due process despite the lack of a

testimonial hearing.  Her Fifth Amendment right to due process was not violated.

C.      Because the Regulations Do Not Deprive Plaintiff of Either Her First or Her Fifth Amendment Rights, Defendants Are Entitled to Dismissal or Summary Judgment On Her First Cause of Action

1.      *Fifth Amendment Right to Travel*

In her first cause of action, Plaintiff alleges that the Regulations and the civil penalty imposed upon her pursuant to the Regulations violate her right to travel as guaranteed by the Fifth Amendment.  The court rejects this argument as baseless and contrary to well-established law.

The Supreme Court has long recognized that, "The right to travel is part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment." Zemel v. Rusk, 381 U.S. 1, 14 (1965) (citing Kent v. Dulles, 357 U.S. 116, 125 (1958)).  However, the Court has emphasized that, for Fifth Amendment purposes, ". . . the *freedom* to travel outside the United States must be distinguished from the *right* to travel within the United States."  Haig v. Agee, 453 U.S. 280, 306 (1981) (emphasis in original).  Unlike the right of interstate travel, which is "virtually unqualified," the freedom to travel internationally is far from absolute, and has been described as ". . . no more than an aspect of liberty protected by the Due Process Clause."  Id. (citing Califano v. Torres, 435 U.S. 1, 4 n.6 (1978)).  The freedom to travel abroad, without more, does not overcome the presumptive constitutionality of travel restrictions based on foreign policy and/or national security justifications.  See Zemel, 381 U.S. at 16; Regan, 468 U.S. at 242.

Plaintiff suggests that, "The circumstances which might trigger the kinds of travel restrictions imposed against plaintiff did not exist in 2003 or at any time thereafter," because

". . . the nation of Iraq posed [no] threat to the national security, foreign policy or economy of the United States." (Cplt. ¶¶ 7, 15). For the reasons discussed above, that is not an argument cognizable by this court. <u>See</u> discussion *supra* p. 16.

Plaintiff also argues that the Regulations were applied in a politically-motivated manner, rendering them unconstitutional. She claims that, "OFAC's enforcement practices bespeak to the selective prosecution of anti-war activists, while favorable journalists were permitted escorted access to Iraq." (Opp. at 16).

Plaintiff's selective prosecution allegation fails to state a claim because plaintiff does not allege that there were any "favorable journalists" who were similarly situated to her. In order to state a claim for selective prosecution, plaintiff is required to show both (1) that she was treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. <u>Cobb v. Pozzi</u>, 363 F.3d 89, 110 (2d Cir. 2004) (citing <u>Harlen Assoc. v. Inc. Vill. of Mineola</u>, 273 F.3d 494, 499 (2d Cir. 2001). Persons must be similarly situated "in all material respects" in order for a selective prosecution claim to be cognizable. <u>Shumway v. United Parcel Serv., Inc.</u>, 118 F.3d 60, 64 (2d Cir. 1997); <u>Holmes v. Gaynor</u>, 313 F.Supp.2d 345, 355 (S.D.N.Y. 2004) (internal citations omitted). Plaintiff does not identify in her Complaint any pro-war journalist who provided a "service" to Iraq but was not sanctioned under the Regulations. In fact, plaintiff does not allege anything in the Complaint that could even arguably be construed as alleging that there were pro-war journalists who were similarly situated to her (i.e., who violated OFAC's Regulations) but who were not prosecuted. In her memorandum of law in opposition to

defendants' motion to dismiss, plaintiff contrasts her prosecution with the "escorted access" that was given to certain journalists – but giving someone "escorted access" is not the same thing as declining to sanction a violation of law. The analogy is inapt in the selective prosecution context.

2. *First Amendment Freedom of Speech*

In her first cause of action, plaintiff also contends that the Regulations' ban on travel to Iraq, and the penalty she faces for violating this ban, infringes upon her First Amendment right to free speech. Because neither the Regulations nor the civil penalty at issue implicates plaintiff's First Amendment rights, plaintiff fails to state a First Amendment claim.

Plaintiff was sanctioned for exporting services to Iraq and engaging in certain unlawful travel-related activities– not for publishing articles in a local newspaper or otherwise exercising her right to free speech. The terms of the PPN and the Penalty Notice make that clear. (AR at 0023; 0053-0056). So plaintiff was not punished for speaking out against the war. Moreover, the Regulations do not ban the gathering or dissemination of news pertaining to Iraq or travel transactions that are solely in connection therewith. Indeed, they were carefully crafted to exempt transactions, "Relating to journalistic activity by persons regularly employed in such capacity by a newsgathering organization." 31 C.F.R. 575.207(c)

In Zemel, the Supreme Court held that the Secretary of State's refusal to validate plaintiff's passport for travel to Cuba did not deny plaintiff any free speech or associational rights as guaranteed by the First Amendment, because the restriction on her travel did not result from any expression or association on plaintiff's part:

> [W]e cannot accept the contention of appellant that it is a First Amendment right which is involved. For to the extent that the Secretary's refusal to validate

passports for Cuba acts as an inhibition (and it would be unrealistic to assume that
it does not), it is an inhibition of action.  There are few restrictions on action
which could not be clothed by ingenious argument in the garb of decreased data
flow.  For example, the prohibition of unauthorized entry into the White House
diminishes the citizen's opportunities to gather information he might find relevant
to his opinion of the way the country is being run, but that does not make entry
into the White House a First Amendment right.  The right to speak and publish
does not carry with it the unrestrained right to gather information.

Zemel, 381 U.S. at 16-17.  Here, as in Zemel, the Regulations and penalties at issue reach only

plaintiff's actions – not her speech.  Therefore, plaintiff has suffered no violation of her First

Amendment rights.

 To the extent that plaintiff's activity as a human shield is deemed expressive anti-war

speech as well as a "service" in violation of the Regulations, plaintiff's case is one in which both

speech and non-speech elements are present in the activity that is restricted.  "A sufficiently

important governmental interest in regulating the nonspeech element can justify incidental

limitations on First Amendment freedoms."  United States v. O'Brien, 391 U.S. 367, 376 (1968).

The Supreme Court has held that incidental government regulation of speech is justified

if (1) the regulation is within the constitutional power of the Government; (2) it furthers an

important or substantial Government interest; (3) the governmental interest is unrelated to the

suppression of free expression; and (4) the incidental restriction on alleged First Amendment

freedoms is no greater than is essential to the furtherance of that interest.  Id. at 377.  Under the

O'Brien standard, any incidental restriction imposed by the Regulations on plaintiff's right to

engage in expressive speech is sufficiently justified.

First, the Regulations clearly fall within the constitutional power of the government, as

they were implemented pursuant to the authority granted by Executive Orders 12,722 and

12,724, and the IEEPA, UNPA and the Iraqi Sanction Act.  See discussion supra pp. 2-4; see

23

<u>also</u> <u>Miranda v. Sec'y of Treasury</u>, 766 F.2d 1, 3 (1st Cir. 1985) ("It is a basic principle of our system of government that, when acting pursuant to Congressional authorization in the field of foreign affairs, the President commands all the political authority of the United States.") (<u>United States v. Curtiss-Wright Export Corp</u>., 299 U.S. 304, 320 (1936)).

Second, "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." <u>Haig</u>, 453 U.S. at 307.

Third, the governmental interest at issue– imposing economic sanctions on Iraq in an effort to alleviate the perceived threat posed by Iraq to our national security– is clearly unrelated to the suppression of free expression.  As the Second Circuit ruled when upholding a requirement that addressees of publications originating in North Vietnam and China obtain licenses before receiving those publications, "[R]estricting the flow of information or ideas is not the purpose of the regulations. The restriction of first amendment freedoms is only incidental to the proper general purpose of the regulations: restricting the dollar flow to hostile nations." <u>Teague v. Regional Comm'r of Customs</u>, 404 F. 2d 441, 445 (2d Cir. 1968).

Fourth, the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of the governmental interest in national security.  As noted above, the Regulations contain an explicit exception permitting journalists to engage in travel-related transactions that would otherwise be illegal.  <u>See</u> 31 C.F.R. 575.207(c).

Therefore, "Applying the Supreme Court's test here [the court] concludes that the [alleged] infringement of first amendment freedoms is permissible as incidental to the proper, important, and substantial general purpose of the regulations."  <u>Teague</u>, *supra*., 404 F.2d at 446.

**Conclusion**

important, and substantial general purpose of the regulations." <u>Teague</u>, *supra.*, 404 F.2d at 446.

## Conclusion

For the foregoing reasons, the complaint is dismissed in its entirely.

The Clerk of the Court is directed to enter judgment in favor of Defendants, and to close .

the file.

This constitutes the decision and order of the Court.

Dated: October 28, 2005.

_____

U.S.D.J.


BY FAX TO ALL COUNSEL

25